PETER J. MESSITTE, UNITED STATES DISTRICT JUDGE
In a previous Opinion[1] the Court held that Plaintiffs, the District of Columbia and the State of Maryland, have standing to challenge actions of President Donald J. Trump, in his official capacity,[2] that they believe violate the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.[3]
Plaintiffs have alleged that the violations consist of the President's actual or potential receipt, directly or indirectly, of payments by foreign, the federal, and state governments (or any of their instrumentalities) in connection with his and the Trump Organization's ownership of the Trump International Hotel in Washington, D.C.[4] They seek declaratory relief establishing *878 their rights vis-à-vis the President's actions as well as injunctive relief prohibiting him from further violating the Clauses.
The President has moved to dismiss the Amended Complaint for failure to state a claim. Although the President made this argument in his Motion to Dismiss and the parties addressed the issue in their briefs in support of and in opposition to the President's Motion, the Court deferred deciding the meaning and applicability of the Clauses until the issue of standing was resolved. Having decided that issue in favor of Plaintiffs, the Court turns to the issue of what the Clauses mean and whether Plaintiffs have otherwise stated claims under them.
For the reasons that follow, the Court determines that Plaintiffs have convincingly argued that the term "emolument" in both the Foreign and Domestic Emoluments Clauses, with slight refinements that the Court will address, means any "profit," "gain," or "advantage" and that accordingly they have stated claims to the effect that the President, in certain instances, has violated both the Foreign and Domestic Clauses. The Court DENIES the Motion to Dismiss in that respect.
I. FACTUAL AND PROCEDURAL BACKGROUND
A full account of the facts alleged in this case is set out in the Court's Standing Opinion.[5] For present purposes, the Court briefly recapitulates the facts necessary to consider the issue at hand.
Many facts are undisputed or essentially undisputed. Donald J. Trump is the President of the United States and the sole or a substantial owner of both the Trump Organization LLC and The Trump Organization, Inc. (collectively, the Trump Organization), umbrella organizations under which many, if not all, of the President's various corporations, limited-liability companies, limited partnerships, and other entities are loosely organized. Am. Compl. ¶¶ 20, 29 (Mar. 12, 2018), ECF No. 95. Of particular importance in the present suit is the President's ownership, through the Trump Organization, of the Trump International Hotel in Washington, D.C. (the Hotel).
The Hotel is a five-star, luxury hotel located on Pennsylvania Avenue, N.W., in Washington, near the White House. Id. ¶ 34. While the President does not actively manage the Hotel, through the Trump Organization, he continues to own and purportedly controls the Hotel as well as the bar and restaurant, BLT Prime, and the event spaces located within the establishment. Id. ¶¶ 29, 34-36. Directly or indirectly, the President actually or potentially shares in the revenues that the Hotel and its appurtenant restaurant, bar, and event spaces generate. Id.
On January 11, 2017, shortly before his inauguration, the President announced that he would be turning over the "leadership and management" of the Trump Organization to his sons, Eric Trump and Donald Trump, Jr. Id. ¶ 30. Prior to taking office, he also announced that all profits earned from foreign governments would be donated to the U.S. Treasury. Id. ¶ 46. The Trump Organization stated that it would not be tracking all payments it might receive from foreign governments and only planned to make an estimate with regard to such payments. Id. However, following his inauguration and, as of the date of the filing of this action, June 12, 2017, the President had made no such "donations" to the U.S. Treasury.[6] See Am. Compl. ¶¶ 46, *879 138. Despite these pronouncements, Plaintiffs allege that the President continues to own and have intimate knowledge of the activities of the Trump Organization. Id. ¶ 31. Indeed, according to Plaintiffs, at the outset of his Presidency one of his sons stated that he would be providing business updates to the President regarding the Organization on a quarterly basis and, although the President may have formed a trust to hold his business assets, it appears that he remains able to obtain distributions from this trust at anytime and may have actually received such payments from time to time. Id. ¶¶ 29, 31-32.[7]
Since the President's election, a number of foreign governments or their instrumentalities have patronized or have expressed a definite intention to patronize the Hotel, some of which have indicated that they are doing so precisely because of the President's association with it. Am. Compl. ¶¶ 39-43. The President has at no time sought the consent of Congress for him to accept the revenues the Hotel receives or could potentially receive from these foreign governments, nor has Congress ever approved the receipt of such revenues. Id. ¶ 33.
In addition, at least one State-Maine-patronized the Hotel when its Governor, Paul LePage, and his entourage visited Washington to discuss official business with the Federal Government, including discussions with the President. Pls.' Opp'n. at 8 (Nov. 7, 2017), ECF No. 46.
Plaintiffs further allege that the Hotel has received a benefit, which they say is an "emolument," from the Federal Government by virtue of the General Services Administration (GSA) Lease which governs the Trump Organization's use of the Old Post Office Building, the site of the Hotel. Am. Compl. ¶¶ 80-86. Thus Section 37.19 of the Old Post Office Lease states: "No ... elected official of the Government of the United States ... shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." Id. ¶ 82. Despite a previous statement from a GSA official that the President would be in violation of the Lease unless he fully divested himself of all financial interest in the Lease, following the President's inauguration, the GSA reversed its position, determining that the President was in fact in compliance with the Lease. Id. ¶¶ 83-84. Since then, the Trump Organization and *880 through it the President have enjoyed the benefits of the Lease.
Plaintiffs allege that these actions of the President, through the Trump Organization, violate both the Foreign and Domestic Emoluments Clauses.
The issue before the Court at this juncture is whether Plaintiffs' allegations state viable claims for relief with respect to the President's purported violations of the Foreign and Domestic Emoluments Clauses.
The key dispute the parties have is over the meaning of the term "emolument"[8] in the Clauses, although more can and will be said about other terms within the Clauses.
Plaintiffs submit that the President's actions clearly offend the Clauses. An "emolument," they say, citing among other things the definition of the term in a considerable number of dictionaries contemporaneous with the Constitutional Convention, as well as the purpose of the Clauses to prevent against possible undue influence upon the federal official, is any "profit," "gain" or "advantage." Am. Compl. ¶¶ 23-28; Pls.' Opp'n at 29-30. Accordingly, say Plaintiffs, the Clauses were framed so as to flatly bar the receipt by anyone holding office under the authority of the United States, including the President, of any profit, gain, or advantage of any nature or kind whatsoever from any foreign, the federal, or state government. Pls.' Opp'n at 29. No exception exists, Plaintiffs continue, even if the foreign, federal, or domestic donor receives a quid pro quo from the officeholder in connection with the officeholder's private undertakings. It is enough that the President directly or indirectly receives money from foreign, the federal, and domestic government officials who patronize his Hotel; the Emoluments Clauses are violated.
The President argues that the Emoluments Clauses do not apply to his actions at all-citing (albeit fewer) other dictionary definitions more or less contemporaneous with the adoption of the Clauses to the effect that an "emolument" refers to a "profit arising from an office or employ." Def.'s Mot. Dismiss at 32 (Sept. 29, 2017), ECF No. 21-1. Based on this definition and what he argues is the purpose and historical context of the Clauses, the President submits that an "emolument" pertains only to a payment made in connection with a particular employment over and above one's salary as, say, President of the United States, so that payments to a federal official for any independent services rendered, such as for the rental of hotel rooms or event spaces privately owned by the officeholder, or payments for meals at his restaurants, privately owned, are payments entirely separate and apart from an "emolument" paid to the President qua President. Id. at 31-32. Accordingly, the Amended Complaint, in the President's view, does not state plausible claims for relief. He urges the Court to dismiss it on these grounds.
Although the President himself does not make the argument, as a preliminary matter one of the Amici Curiae suggests that the President is not covered by the Foreign Emoluments Clause at all because his elective office does not "arise under the authority" of the United States. See Br. for Scholar Seth Barrett Tillman & The Judicial Education Project as Amici Curiae in Support of Def. (Oct. 6, 2017), ECF No. 27-1 (Professor Tillman). The Court deals briefly with this latter argument at the outset.
*881 II. STANDARDS FOR CONSTITUTIONAL INTERPRETATION
The Court begins with a review of the standards for judicial interpretation of a clause in the Constitution.
Although there has been much public debate, especially in recent years, over which theory or theories should be applied in interpreting constitutional provisions -ranging from strict constructionism,[9] originalism[10] and original meaning[11] to the purposive approach[12] and the Living Constitution,[13] with perhaps shadings in-between-the parties do not lock horns over this. Both sides embrace a blend of original meaning and purposive analysis (i.e., relying on external aids, especially dictionary definitions more or less contemporaneous with the Constitutional debates and, insofar as possible, the intent of the Framers) in support of their view that the Emoluments Clauses should or should not apply to the President and, if applicable, to which of his actions they should apply.[14]
Supreme Court precedent confirms that a blend of textualism and purposivism should guide the Court's approach.
The meaning of a Constitutional provision "begin[s] with its text." City of Boerne v. Flores , 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Where *882 the text is clear, "there is no room for construction and no excuse for interpolation or addition." United States v. Sprague , 282 U.S. 716, 731-32, 51 S.Ct. 220, 75 L.Ed. 640 (1931) (citing, inter alia, Martin v. Hunter's Lessee , 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816) ). Moreover, in interpreting the text, the Court is "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' " District of Columbia v. Heller , 554 U.S. 570, 576, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (quoting Sprague , 282 U.S. at 731, 51 S.Ct. 220 ). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meaning that would not have been known to ordinary citizens in the founding generation." Id. at 576-77, 128 S.Ct. 2783. To determine the original public meaning, the Supreme Court has looked to founding-era dictionaries and other contemporaneous sources. See NLRB v. Noel Canning , --- U.S. ----, 134 S.Ct. 2550, 2561, 189 L.Ed.2d 538 (2014) (discussing founding-era dictionary definitions and the Framers' use of the word "recess" in the Constitution's Recess Appointments Clause); Heller , 554 U.S. at 581-86, 128 S.Ct. 2783 (looking to founding-era dictionaries, William Blackstone's Commentaries on the Laws of England , and State constitutions to determine the meaning of the Second Amendment).
When a constitutional provision is ambiguous, however, the Court has recognized the need "to consider the Clause's purpose and historical practice." Noel Canning , 134 S.Ct. at 2559, 2568 ("[I]n interpreting the Clause, we put significant weight upon historical practice.") (emphasis omitted); id. at 2559 ("[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President.") (citation and quotation marks omitted); see also Heller , 554 U.S. at 592, 128 S.Ct. 2783 ("This meaning is strongly confirmed by the historical background of the [provision]."). Importantly, moreover, the Supreme Court has treated executive practice and precedent "as an interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." Noel Canning , 134 S.Ct. at 2560, 2562-63 (evaluating past historical practice and discussing Government ethics opinions to inform the Court's determination "of what the law is").
III. THE EMOLUMENTS CLAUSES
Because one of the Amici Curiae has suggested that the Foreign Emoluments Clause does not apply to the President at all, the Court briefly addresses this issue before turning to the meaning of the term "emolument" itself.[15]
A. "Office of Profit or Trust under [the United States]"
Amicus Curiae Professor Seth Barrett Tillman of the Maynooth University Department of Law argues that the Foreign Emoluments Clause does not extend to the President because the Presidency does not qualify as an "Office of Profit or Trust under [the United States]." The Framers, he says, distinguished between different federal offices and drafted different rules for these distinct federal positions. Tillman Br. at 2, 4. Specifically, Professor Tillman argues that an office "under the United States," which is the language used in the *883 Foreign Emoluments Clause, refers to a federal appointed position that "is created, regularized, or defeasible by statute." Id. at 7. According to Professor Tillman, the Clause does not reach elected positions; to the contrary, he says, only express language can reach the Presidency.
Professor Tillman claims that this conclusion is supported by both the text and history of the Constitution. He submits, for example, that in the Colonial Period the phrase "Office under the Crown" was a commonly-used drafting convention that referred only to appointed-not elected-positions, a distinction that he suggests remains operative in the United Kingdom today. Id. at 8-9. The Framers of the Constitution and the First Congress, he continues, adhered to this drafting convention. He points to an anti-bribery statute enacted in 1790 in which Congress declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold any office of honor, trust, or profit under the United States." Id. at 13 (citing An Act for the Punishment of Certain Crimes, ch. 9, 1 Stat. 112, 117 (1790) ). Professor Tillman argues that this statute could not have been understood to include the Presidency because Congress does not have the power to add new qualifications for federal elected positions. Id. In further support of his theory, he points out that, in 1792, the Senate directed President George Washington's Secretary of the Treasury, Alexander Hamilton, to draft a financial statement listing the "emoluments" of every person holding "any civil office or employment under the United States." Id. at 15 (citing 1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry) ). Since Hamilton's response did not include the President, Vice President, Senators, or Representatives, Amicus says this is a further indication that the founding-era generation did not consider the phrase "office under the United States" to extend to elected positions. Id. at 15-16.
Despite Amicus ' citations to a select number of historical examples, the Court finds that the text, history, and purpose of the Foreign Emoluments Clause, as well as executive branch precedent interpreting it, overwhelmingly support the conclusion that the President holds an "Office of Profit or Trust under [the United States]" within the meaning of the Foreign Emoluments Clause.
1) Text
Beginning with the text of the Clause, the only logical conclusion, when read with the rest of the Constitution, is that the President holds an "Office of Profit or Trust under [the United States]." The Constitution repeatedly refers to the President as holding an "office." See, e.g. , U.S. Const. art. II § 1, cl. 1 ("[The President] shall hold his Office during the Term of four Years[.]"); id. , cl. 5 (eligibility requirements for the "Office of President"); id. cl. 8 (requiring the President take an oath to "faithfully execute the Office of President of the United States."). And if text is to be given its plain meaning, the "Office of the President" is surely one of both profit and trust. See Sprague , 282 U.S. at 731-32, 51 S.Ct. 220 (stating that the Constitution's "words and phrases were used in their normal and ordinary" meaning). The President receives compensation for his services (profit) and is entrusted with the welfare of the American people (trust). See, e.g. , Deborah Sills, The Foreign Emoluments Clause: Protecting Our National Security Interests, 26 Brooklyn J. L. & Pol'y 63, 81 ("The term 'Office of Profit' refers to an office in which a person in office receives a salary, fee, or compensation. The term 'Office of Trust,' refers to offices involving 'duties of which are particularly important.' ") (citing Application of the Emoluments Clause to a Member of the Presi dent's Council on Bioethics *884 , 29 Op. O.L.C. 55, 61-62 (2005) ).[16]
The text also indicates that the President's "Office of Profit or Trust" is one "under the United States." As the Domestic Emoluments Clause illustrates, the term "United States" is used in the Constitution to distinguish between the federal and state governments. See U.S. Const. art. II, § 1, cl. 7 (forbidding emoluments from the United States or "any of them," referring to the States). As a federal office holder, then, the President holds his office "under the United States."
Indeed, reading the phrase "Office of Profit or Trust under [the United States]" to exclude the President would lead to an essentially absurd result. Consider Article I, Section 3, cl. 7 of the Constitution, which provides that an impeached official shall be disqualified from holding "any Office of honor, Trust or Profit under the United States." U.S. Const. art. I, § 3, cl. 7. As a Memorandum issued by the Brookings Institution highlights, "[i]f the President did not hold an office 'under the United States,' a disgraced former official would be forbidden from every federal office in the land, but could be President." Norman Eisen, Richard Painter, & Laurence Tribe, The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump at 8, Brookings Institution (Dec. 16, 2016), https://www.brookings.edu/wp-content/uploads/2016/12/gs_121616_emoluments-clause1.pdf (Brookings Memorandum).[17]
In all, reading the Constitution as a complete document rather than piecemeal establishes that the President holds an "Office of Profit or Trust under [the United States]."
2) Original Public Meaning & Purpose
Even if the text were ambiguous, the historical context and purpose of the Foreign Emoluments Clause confirm that the Framers understood the Presidency to be an "Office of Profit or Trust under [the United States]." As one historical scholar has noted, when the totality of founding-era evidence is considered, "an avalanche buries [Tillman's] fanciful claims." Prakash, supra note 17, at 147.
*885 To start, the Federalist Papers on numerous occasions refer to the President as the occupier of an "office." See, e.g. , The Federalist No. 39 (James Madison) ("The President of the United States is impeachable at any time during his continuance in office .") (emphasis added); The Federalist Nos. 66 (Alexander Hamilton) ("It will be the office of the President ..." (emphasis added), 68 ("the office of President") (emphasis added) ). Though Professor Tillman places great emphasis on the conduct of Washington and Hamilton, he curiously fails to explain why both these individuals on other occasions also refer to the "office of President." See, e.g. , Letter from George Washington to Solomon Bush (Nov. 24, 1789), Library of Congress Digital Collection, https://www.loc.gov/collections/george-washington-papers/?fa=segmentof% 3Amgw2.022% 2F&sp=3&st=slideshow&sb=shelf-id (referring to his election to the "Office of President of the United States"); Letter from Alexander Hamilton to George Washington (Sept. 1788), https://founders.archives.gov/documents/Hamilton/01-05-02-0037 (discussing Washington's "acceptance of the office of President").
Moreover, in light of the purpose of the Foreign Emoluments Clause, as discussed in greater detail below,[18] the "office" of the President was explicitly understood to be one of "Profit or Trust under [the United States]." The few discussions surrounding the Clause indicate that the Framers were extremely concerned about possible improper and undue influences on the President in particular. See pages 896-98, infra . Edmond Randolph, at the Virginia Ratification Convention, expressly described the Clause as applying to the President. 3 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787 486 (2d ed. 1891) (stating that the Clause protects against the threat of the "President receiving emoluments from foreign powers") (emphasis added). Insofar as that is so, the Framers must have understood him to hold an "Office of Profit or Trust under [the United States]."
Professor Tillman's argument that the First Congress must have understood the phrase "Office of Profit or Trust under [the United States]" to exclude the President because of the existence of the 1790 anti-bribery statute is especially perplexing. That Congress would have intended a person convicted of bribing a federal judge to be banned from holding every federal office except the office of President is, in the Court's view, altogether unlikely.
3) Executive Branch Precedent and Practice
Finally, if the foregoing considerations were not in and of themselves dispositive of Professor Tillman's argument, consistent executive branch practice and precedent over the years have definitively put his thesis to rest. As the OLC stated in 2009, "[t]he President surely "hold[s] an[ ] Office of Profit or Trust[.]" Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize , 33 Op. O.L.C. 1, 4 (2009). This statement was fully consistent with prior OLC opinions that had applied the Foreign Emoluments Clause to the President. See, e.g., Proposal That the President Accept Honorary Irish Citizenship , 1 Supp. Op. O.L.C. 278, 278 (1963) ("I believe that acceptance by the President of honorary Irish citizenship would fall within the spirit, if not the letter, of [the Foreign Emoluments Clause].").
The Court concludes that the President holds an "Office of Profit or Trust *886 under [the United States]" and, accordingly, is subject to the restrictions contained in the Foreign Emoluments Clause.
The question remains: What are those restrictions?
B. "Emolument"
Having determined that both Emoluments Clauses apply to the President, the Court must now decide what the term "emolument" within them means.
1) Text
While both parties begin with the text of the Clauses, they offer significantly different textual interpretations.
Plaintiffs argue that the text indicates a clear intention that a broad definition of "emolument," applies, that it means any "profit," "gain," or "advantage." Not only was this definition more common at the time of the drafting,[19] they say. This definition best accords with the surrounding text of the Clauses. Indeed, Plaintiffs continue, both Clauses contain expansive modifiers. The Foreign Emoluments Clause bans "any " "Emolument ... of any kind whatever ." Pls.' Opp'n at 33. Similarly, the Domestic Emoluments Clause prohibits the President's receipt of "any other Emolument." In Plaintiffs' view, these modifiers indicate that the term was meant to have the widest possible scope and applicability. Id. at 35.
These expansive modifiers, Plaintiffs argue, stand in marked contrast to the only other place in the Constitution where the term "emolument" appears, the Incompatibility Clause, which restricts increases in the compensation of members of Congress.[20] That clause contains a restrictive modifier, limiting its applicability to the "Emoluments whereof ," suggesting its limited applicability to the office of Congressmen alone. Plaintiffs dispute that any meaningful comparison can be made between the Incompatibility Clause and the Emoluments Clauses since neither of the latter two contains such a restrictive modifier. Pls.' Opp'n at 41 n.28.
Despite the President's argument to the contrary, Plaintiffs say that interpreting "emolument" to cover essentially anything of value would not create redundancies within the Foreign Emoluments Clause's separate ban on "presents." Rather, they submit, the term "present" in the Foreign Clause was likely intended to ensure that the acceptance of any unsolicited, unreciprocated "gift" given merely as a sign of gratitude would be covered, whereas the prohibition against receipt of an "emolument" would reach payments made with the more obvious intention to influence. Id. at 34-35 n.22. The point is that both types of payments would be covered.
The President, while acknowledging that the broader definition of "emolument" advanced by Plaintiffs also existed during the founding era, asserts that this should be of no importance because the term has to be read in context with the rest of the words of the Emoluments Clauses under the familiar rule of construction known as noscitur a sociis .[21]
*887 Doing so, he submits, supports his position that an "emolument" is only a payment made as compensation for official services.
The President claims that this narrower definition of "emolument" is more consistent with the nature of the other prohibited categories in the Foreign Clause. "Present," "office," and "title" are all things personally conferred or bestowed upon a U.S. official. Def.'s Mot. Dismiss at 33. The terms "any" and "any kind whatever," he says, are included in the Clauses simply to ensure that every type of identified compensation, e.g., "present," "office," "title", is captured by the Clause. This is not, he claims, a basis to choose whether "emolument" has a separate meaning. Def.'s Reply at 19 (Dec. 1, 2017), ECF No. 70.
The President argues that his position is further bolstered by the text of the Domestic Emoluments Clause where, he says, "compensation" is qualified by "for his services," meaning that "any other Emolument" must also be qualified by "for his services." Def.'s Mot. Dismiss at 33. In effect, the President argues that the Domestic Emoluments Clause should read: "The President shall, at stated Times, receive for his Services, a Compensation, ... and he shall not receive [for his services] within that Period any other Emolument[.]"
Further, referring to the Constitution as a whole, the President maintains that the Incompatibility Clause actually supports his argument that "emolument" refers to compensation for an officeholder's services. Def.'s Reply at 20. In his view, because the Incompatibility Clause treats an "emolument" as an aspect of an office that cannot be increased, it expressly ties an emolument to an official's employment and duties, which suggests the same meaning for the term in the Emoluments Clauses. Id. Acknowledging that the Incompatibility Clause contains a restrictive modifier, the President dismisses this as a result of the fact that it deals with a specific office-i.e., the civil office for which salary has been increased-whereas the Foreign Emoluments Clause does not include any such office-related limitation. Id. In other words, because the Foreign Emoluments Clause does not reference a specific office, it supposedly has a broader reach than the Incompatibility Clause. It regulates not only compensation or benefits for jobs held by former Senators or Congressmen; it extends to benefits payable to any federal official in his capacity as a federal official. Id. The term "emolument" is not meant to have a broader scope.
Finally, says the President, interpreting "emolument" to cover anything of value would create unnecessary redundancies within the Foreign Clause because it would include within its scope the term "present," which necessarily has a separate and undisputed meaning. Interpreting a term to create such a redundancy, he continues, runs counter to Supreme Court precedent, which states that "every word must have its due force, and appropriate meaning" because "it is evident" that "no word was unnecessarily used, or needlessly added." Def.'s Mot. Dismiss at 36 (quoting Holmes v. Jennison , 39 U.S. (14 Pet.) 540, 570-71, 10 L.Ed. 579 (1840) ).
The Court agrees with the parties that the term "emolument" must be read in harmony with the surrounding text of the Emoluments Clauses. But ultimately it finds Plaintiffs' arguments more persuasive. The text of both Clauses strongly indicates that the broader meaning of "emolument" advanced by Plaintiffs was meant to apply. As Plaintiffs point out, the Foreign Clause bans, without Congressional approval, "any present, Emolument, Office, or Title, of any kind whatever , from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8 (emphasis added). Use of such expansive modifiers *888 significantly undermines the President's argument that this Clause was meant to prohibit only payment for official services rendered in an employment-type relationship. If there were any doubt as to the limits of the Foreign Clause, the Framers used the word "any" twice, ensuring a broad and expansive reach. The President's argument that these modifiers merely ensure that the Foreign Clause bans receipt of every type of "present," "emolument," "office," or "title" is unconvincing. Even without the inclusion of the modifier "of any kind whatever" in the Foreign Clause, it would still ban every type of prohibited category because it provides no exceptions. If "no word was unnecessarily used," as the President argues, Def.'s Mot. Dismiss at 36, his own position runs aground. The more logical conclusion is the one that Plaintiffs urge: The use of "any kind whatever" was intended to ensure the broader meaning of the term "emolument."
The phrase "any other Emolument" in the Domestic Emoluments Clause suggests the same broad interpretation of the term. The Court does not read the Clause to qualify "emolument" by the words "for his services." The use of "any other" in the Clause once again points firmly in Plaintiffs' direction. The Court, in effect, construes the Clause to read: "The President shall ... receive for his Services, a Compensation, ... and he shall not receive [for any reason] within that Period any other Emolument [of any kind]." But ultimately, even allowing that the term "emolument" might be qualified by the words "for his services" in the Domestic Clause, this amounts to no silver bullet for the President. Logic equally suggests that the payments, direct or indirect, that he receives from domestic governments in connection with the Hotel are in fact "emoluments" to his salary as President. Again, it has been alleged that the State of Maine patronized the Hotel when its Governor, Paul LePage, and his staff visited Washington to discuss official business with the Federal Government, including holding discussions with the President as President, Pls.' Opp'n. at 8, and when, on at least one of those trips, Governor LePage and the President appeared together at a news conference at which the President signed an executive order to review actions of the prior administration that established national monuments within the National Park Service, which could apply to a park and national monument in Maine, which President Obama had established over Governor LePage's objections in 2016. Id.
Equally unpersuasive is the President's argument that the meaning of the term "emoluments" in the Incompatibility Clause somehow undermines Plaintiffs' claims. As Plaintiffs point out, unlike the Emoluments Clauses, the Incompatibility Clause contains a restrictive modifier limiting the "Emoluments whereof" mentioned there to an expressly referenced office, viz. the office for which compensation has been increased by Congress. It most assuredly weighs in favor of Plaintiffs' argument that the Framers felt the need to include such a modifier. If "emolument" were always to be read as a synonym for salary or payment for official services rendered, this modifier in the Incompatibility Clause would have been unnecessary.
Nor does interpreting "emolument" to mean "profit," "gain," or "advantage," as the President suggests, render the term "present" in the Foreign Emoluments Clause redundant. As the President himself concedes, a "present" in the founding era was defined then, as it is today, as something "bestowed on another without price or exchange." Def.'s Mot. Dismiss at 37. It has been noted that historically unsolicited gifts, i.e. presents, were commonly given by European heads of state as a matter of custom. See Zephyr Teachout, *889 Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United 1-5 (2014). In contrast, the term "emolument," used in reference to a "profit," "gain," or "advantage" from any kind of exchange[22] enables the Foreign Clause to reach private commercial transactions that would not be covered by the term "present." Thus, even if the term "emolument" was sometimes used synonymously with the term "present," its use in the Foreign Emoluments Clause would ensure that the Clause covered all types of financial transactions-solicited or unsolicited, reciprocated or unreciprocated, official or private.
On the other hand, the President's cramped interpretation of the term would seem to create its own concerning redundancies within the Constitution. Characterizing an "emolument" as "the receipt of compensation for services rendered by an official in an official capacity," Def.'s Mot. Dismiss at 31, is tantamount to defining the transaction as nothing less than one of federal bribery, a crime which prohibits a federal public official from, directly or indirectly, receiving or accepting "anything of value" in return for "being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). Given that Article II, Section 4 of the Constitution already addresses the crime of bribery, making it an impeachable offense,[23] there would have been little need to include two additional and distinct Emoluments Clauses prohibiting the acceptance of money from foreign or state governments for official services rendered. Moreover, it seems highly unlikely that the Framers would have intended bribery to be both an impeachable offense and, at the same time, an activity Congress could consent to when a foreign government donor is involved. The President makes no attempt to come to terms with this anomaly.
Accordingly, given the text of both Clauses, the Court begins with a strong presumption that the term "emolument" should be interpreted broadly to mean "profit," "gain," or "advantage," essentially covering anything of value.[24]
2) Original Public Meaning
Because the Constitution was "written to be understood by the voters," Heller , 554 U.S. at 576, 128 S.Ct. 2783, it is important to consider the meaning of the term "emolument" against the backdrop of what ordinary citizens at the time of the Nation's founding would have understood it to mean. Though the parties apparently agree that the term "emolument" had at least two meanings at the time of the Constitutional Convention, they diverge as to its ordinary, common usage by the founding generation.
Plaintiffs contend that the most common definition of emolument at the time was "profit," "gain," or "advantage." Pls. Opp'n at 31 (citing 1 Johnson, A Dictionary of the English Language (6th ed. 1785); Bailey, An Universal Etymological English *890 Dictionary (20th ed. 1763) ). Indeed, they cite an article by Professor John Mikhail of Georgetown University Law Center in which, following exhaustive research, he concluded that "every English dictionary definition of 'emolument' from 1604 to 1806" includes Plaintiffs' broader definition. Id. (citing John Mikhail, The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806 , 1-2 (June 30, 2017), https://ssrn.com/abstract=2995693). Moreover, say Plaintiffs, the word was often used in this broad sense by drafters of State constitutions, by Blackstone, by Supreme Court Justices, and by the Framers themselves. Id. at 31-32 (citing Pa. Const., art. V (1776) ("[G]overnment is... instituted ... not for the particular emolument or advantage of any single man."); John Mikhail, "Emoluments" in Blackstone's Commentaries , Balkinization, May 28, 2017, https://balkin.blogspot.com/2017/05/emolument-in-blackstones-commentaries.html (listing instances in which Blackstone used the word to mean "family inheritance, private employment, and private ownership of land"); John Mikhail, A Note on the Original Meaning of "Emolument," Balkinization, Jan. 18, 2017, https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html (providing examples of the Framers-including Jefferson, Washington, and Madison-using the word to refer to "the consequences of ordinary business dealings"); Himely v. Rose , 9 U.S. (5 Cranch) 313, 318-19, 3 L.Ed. 111 (1809) (Johnson, J.) ("profits and advantages" from land ownership) ).
On the other hand, Plaintiffs submit that the definition advanced by the President- "profit arising from an office or employ"-was far less common. Citing the Mikhail article, Plaintiffs assert that while the definition they advance can be found in virtually every founding-era dictionary, the President's definition appears in less than 8% of these dictionaries. Id. at 32 (citing Mikhail, The Definition of "Emolument," supra, at 1-2). This, according to Plaintiffs, confirms that the President's narrow definition was not the ordinary meaning of the term "emolument" that voters of the time would have understood.
In response, the President invites the Court's attention to alternate sources that he claims define "emolument" as a "profit arising from an office or employ." Def.'s Mot. Dismiss at 34 (citing Barclay's A Complete and Universal English Dictionary on a New Plan (1774); 1 John Trusler, The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of Them Determined 154-55 (1766) ). The President submits that the use of the term to refer to receipt of value for one's services rendered in an official capacity is consistent with these particular contemporaneous dictionary definitions. Id. at 34-35. In fact, he cites examples from the Oxford English Dictionary as far back as 1480,1650, and 1743, providing as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary." Id. (citing Oxford English Dictionary, Oxford University Press, Emolument , OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242).
The President also criticizes Plaintiffs' "mechanical counting of dictionaries," noting that the Mikhail article fails to account for frequency of usage. Def.'s Reply at 17. He argues that at the time of the Nation's founding, an "emolument" was a common characteristic of federal office, described by the Supreme Court as "every species of compensation or pecuniary profit derived from a discharge of the duties of office." Def.'s Mot. Dismiss at 31 (quoting Hoyt v. United States , 51 U.S. (10 How.) 109, 135, 13 L.Ed. 348 (1850) ). In light of this view of contemporaneous common usage, the *891 President asserts that his definition is more likely the original public meaning of the term.
His narrower definition, the President says, is also closely related to the etymology of the word "emolument," which references "profit from labor" or "profit from grinding corn." Id. at 35 (citing Walter W. Skeat, An Etymological Dictionary of the English Language 189 (1888) (emolument: "profit, what is gained by labour"); The Barnhart Dictionary of Etymology 326 (1988) (emolument: "n. profit from an office or position. 1435, in Proceedings of the Privy Council ; borrowed through Middle French émolument , and directly from Latin émolumentum profit, gain, (originally) payment to a miller for grinding corn, from émolere grind out (é- out + molere to grind; see MEAL grain)") ). Because Plaintiffs, and the Mikhail article upon which they rely, ignore dictionaries that include variations of this etymologically rooted definition, the President claims they significantly understate the percentage of dictionaries supporting his position. Def.'s Reply at 18-19.
The President argues that Plaintiffs "expansive construction is further undermined by a proposed constitutional amendment that would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens." Def.'s Mot. Dismiss at 44. Specifically, the amendment, which was proposed in 1810, would have prohibited any citizen of the United States from accepting, without the consent of Congress, "any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power." Def.'s Mot. Dismiss at 44-45 (citing Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ). The consequence of doing so, under the proposed amendment, would have been revocation of one's citizenship. Id. While acknowledging that no debates were held on this proposed amendment, the President contends that it is "implausible" that the amendment would have been understood to revoke the citizenship of anyone who might be engaged in commerce with foreign governments or their instrumentalities. Id. at 45. The original public meaning of "emolument," he concludes, could not therefore be as broad as Plaintiffs propose.
Again, in the Court's view, Plaintiffs carry the day.
The clear weight of the evidence shows that an "emolument" was commonly understood by the founding generation to encompass any "profit," "gain," or "advantage." Though the Court agrees that mere counting of dictionaries may not be dispositive, it nonetheless remains highly remarkable that "every English dictionary definition of 'emolument' from 1604 to 1806 relies on one or more of the elements of the broad definition DOJ rejects in its brief." Mikhail, The Definition of "Emolument," supra , at 1-2.[25] Moreover, "92% of these dictionaries define 'emolument' exclusively in these terms, with no reference to 'office' or 'employment.' " Id. No less important is the fact that even the few sources that do reference an office or employment as part of their definition of "emolument," include as well the definitions of "gain, or advantage," a point the President fails to address in his pleadings. Id. at 8 n.26 (noting that Barclay's full definition of "emolument" is "profit arising from profit or employ; gain or advantage ."
*892 (emphasis added) ). Further, the President relies heavily on two pre-Constitutional Convention sources, Barclay (1774) and Trusler (1776), despite the fact that, as Professor Mikhail points out, there is "little to no evidence" that either of these two dictionaries "were owned, possessed, or used by the founders." Mikhail, The Definition of "Emolument," supra , at 13 (noting that "neither of these dictionaries is mentioned in the more than 178,000 searchable documents in the Founders Online database, which makes publicly available the papers of the six most prominent founders."). On the other hand, in the four dictionaries which have been deemed by Justice Antonin Scalia and Bryan A. Garner as " 'the most useful and authoritative' English dictionaries from 1750-1800,"[26] "emolument," consistent with Plaintiffs' view, is variously defined as "profit," "gain," or "advantage." Id. at 18 (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 419 (2012) ).
In addition to its broad meaning in a far greater number of founding-era dictionaries, the term "emolument" was also used in a broad sense in eighteenth century legal and economic treatises. As Professor Mikhail points out, in his Commentaries on the Laws of England , Blackstone uses the word "emolument" on at least sixteen occasions, the majority of those not tied to the performance of official duties or public office. See Mikhail, "Emolument" in Blackstone's Commentaries, supra , (listing examples). Blackstone, for example, refers to the benefits of third-party beneficiaries as "the emolument of third persons," discusses the "emoluments arising from inheritance," and references "pecuniary emoluments" in the context of bankruptcy. 2 William Blackstone, Commentaries on the Laws of England *30 ("The thing given in lieu of tithes must be beneficial to the parson, and not for the emolument of third persons only") (emphasis added); *76 ("The heir, on the death of his ancestor, if of full age, was plundered of the first emoluments arising from his inheritance, by way of relief and primer seisin; and, if under age, of the whole of his estate during infancy.") (emphasis added); *472 ("[W]hereas the law of bankrupts, taking into consideration the sudden and unavoidable accidents to which men in trade are liable, has given them the liberty of their persons, and some pecuniary emoluments , upon condition they surrender up their whole estate to be divided among their creditors[.]") (emphasis added).[27]
Similarly, Adam Smith in his The Wealth of Nations -a treatise which the *893 Framers were unquestionably well aware of[28] -used the term "emolument" twice to refer to instances involving private market transactions. See 1 Adam Smith, Inquiry into the Nature and Causes of the Wealth of Nations 92 (9th ed. 1799) ("The monopolists, by keeping the market constantly under-stocked ... sell their commodities much above the natural price, and raise their emoluments , whether they consist in wages or profit, greatly above their natural rate.") (emphasis added); 2 Smith, id. , at 234 ("[The bank] makes a profit likewise by selling bank money at five per cent agio, and buying it in at four. These different emoluments amount to a good deal more than what is necessary for paying the salaries of officers, and defraying the expense of management.") (emphasis added).
Though the President cites to a Supreme Court decision in support of his claim that his narrow definition was more commonly used, his reliance on the Court's language in Hoyt v. United States , in this Court's view, is misplaced. In Hoyt , the Supreme Court was interpreting an 1802 statute referring to "the annual emoluments of any collector" of the customs. Hoyt v. United States , 51 U.S. (10 How.) 109, 135, 13 L.Ed. 348 (1850) (citing 2 Stat. 172, § 3 (1802) ). Given that the term was tied to a particular office in that context, Hoyt has no broader teaching for understanding the term "emolument" in the present case.[29]
There is, moreover, a substantial body of evidence suggesting that the founding generation used the word "emolument" in a variety of contexts reaching well beyond payments tied to official duties.
Starting with the debates leading up to and during the Constitutional Convention, there are several instances of delegates discussing "emoluments" in a sense that cannot logically be read to mean simply payment for services rendered in an official capacity. For example, during the debates in the Continental Congress on the Articles of Confederation, George Walton, a delegate from Georgia, stated: "The Indian trade is of no essential service to any Colony .... The emoluments of the trade are not a compensation for the expense of *894 donations." "[July 1776]," Founders Online, National Archives, last modified April 12, 2018, http://founders.archives.gov/documents/Adams/01-02-02-0006-0008 (emphasis added). Later on, at the Virginia Ratification Convention, Edmond Randolph, when discussing the purpose of the Foreign Emoluments Clause, used the term in a broad sense, stating "[a]ll men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community ...." 3 Elliot, supra , at 465 (emphasis added). A logical reading of both sentences clearly reflects an understanding that "emolument" covers private market transactions, not merely official ones.
George Washington himself used the term "emolument" frequently in private commercial contexts consistent with Plaintiffs' interpretation. See, e.g., "Proclamation on Intercourse with British Warships, 29 April 1776," Founders Online , National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Washington/03-04-02-0132 (referring to "wicked Persons, preferring their own, present private Emolument to their Country's Weal") (emphasis added); "Virginia Nonimportation Resolutions, 22 June 1770," Founders Online , National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Jefferson/01-01-02-0032 (calling for a boycott of sellers of British and European goods who "have preferred their own private emolument , by importing or selling articles prohibited by this association, to the destruction of the dearest rights of the people of this colony." (emphasis added).[30] As President Trump himself notes, Washington's conduct "has been accorded significant weight." Def.'s Mot. Dismiss at 44 (citing Akhil Amar, America's Unwritten Constitution 309 (2012) ("Washington set precedents from his earliest moments [as President] .... Over the ensuing centuries, the constitutional understandings that crystallized during the Washington administration have enjoyed special authority over a wide range of issues.") ).
In fact, it seems that when the founding generation intended "emolument" to refer only to an official salary or payments tied to holding public office, they did so expressly. For example, The Federalist Papers, understood to have been penned by Hamilton and Madison, refer to "emoluments of office ." The Federalist No. 55 (emphasis added). Washington also used this phrase in his correspondence. See Letter from George Washington to Joseph Jones (Dec. 14, 1782), Library of Congress Digital Collection, https://www.loc.gov/resource/mjm.01_0833_0835/?sp=2 ("if both were to fare equally alike with respect to the emoluments of office ") (emphasis added).
Ignoring this large accumulation of historical evidence, the President places considerable emphasis on the failed constitutional amendment proposed in 1810, which sought to revoke the citizenship of any individual who accepted or retained "emoluments" from a foreign government. For a proposal that never became law, and apparently underwent virtually no debate by the Framers, it is doubtful that much, if any weight should be accorded to it. But if nothing else, insofar as the bill enjoyed any support, it was at the very least reflective of the extreme concern of its proponents over the potentially corrupting influence of payments from foreign governments.
In the Court's view, the decisive weight of historical evidence supports the conclusion that the common understanding of the *895 term "emolument" during the founding era was that it covered any profit, gain, or advantage, including profits from private transactions. Consideration of the purpose of both Emoluments Clauses confirms the broad interpretation of the term suggested by Plaintiffs.
3) Constitutional Purpose
Plaintiffs argue that even if the meaning of the term "emolument" is deemed ambiguous, the constitutional purpose of the Clauses indicates that it was Plaintiffs' broader definition that was intended. Pls.' Opp'n at 32 (citing Noel Canning , 134 S.Ct. at 2561 ). As to the Foreign Emoluments Clause, Plaintiffs argue that the purpose of the Clause was to prevent the least possibility of undue influence and corruption being exerted upon the President by foreign governments. Id. at 34. That is, the Framers created a prophylactic rule to prevent the slightest chance of such influence. Id. Plaintiffs assert that the President's narrow interpretation, which they emphasize essentially boils down to the equivalent of a prohibition against bribery, would completely erode this aim. Bribery as a crime is very difficult to establish, they point out, and any requirement that a quid pro quo for official services has to be established would be easy to circumvent while at the same time difficult to prove. Id. at 42-43. It therefore seems highly unlikely that the Framers would have wanted to leave a large loophole that would preclude the Clause from accomplishing any meaningful purpose. Id.
As to the Domestic Emoluments Clause, Plaintiffs argue that it reflects a similar intention to "eliminate any pecuniary inducement the President might have to betray his constitutional duty in solely serving the People of the United States." Id. at 35. Citing The Federalist Papers, Plaintiffs assert that the Framers worried about any state government or its officials being able to tempt the President and cause him "to surrender" his "judgment to their inclinations," while forcing states to compete with each other to "appeal[ ] to his avarice." Id. (citing The Federalist No. 73 (Alexander Hamilton) ).Thus, say Plaintiffs, it makes sense to infer that the Framers intended the term "emolument" to sweep broadly. Id. Moreover, because the Domestic Clause only covers "emoluments" and not "presents" as the Foreign Clause does, Plaintiffs point out that the President's narrow definition of "emoluments," insofar as it would only cover payments for official services (i.e., bribery), would permit large-possibly unlimited-cash payments from the federal and state governments, so long as the payments were made for non-official personal services or so long as they are characterized simply as non-quid pro quo "presents." Id. at 43-44. These concerns, Plaintiffs argue, warrant interpreting "emolument" to encompass essentially "anything of value."
The President disputes that either the Foreign or Domestic Clause was intended to have the broad reach Plaintiffs advocate. Rather than being "comprehensive conflict-of-interest provisions covering every conceivable type of activity," he argues that the Clauses were only intended to prohibit receipt of specifically identified categories of compensation. Def.'s Reply at 21. For example, he says, the Foreign Emoluments Clause was adopted against the backdrop of a prevailing custom among European sovereigns to bestow valuable presents upon the conclusion of treaties. In his view, this concern was reflected in Edmond Randolph's speech at the Virginia Ratification Convention where he discussed an incident in which King Louis XVI of France bestowed gifts on American diplomats. Def.'s Mot. Dismiss at 38-39 (citing 3 Elliot, supra , at 465-66; Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791). The President submits *896 that it is more likely that the Framers wanted to prevent incidents such as these rather than to prevent federal officials from maintaining private businesses. Id.
Similarly, according to the President, the Domestic Emoluments Clause was adopted to ensure that the President's compensation would remain unaltered during his tenure, not to prevent him from acting on the same terms as every other citizen in transacting private business. Id. at 40.
The President claims that these narrower intentions are supported by the fact that it was common at the time of the founding for federal officials to maintain their own private businesses. Def.'s Reply at 21. He argues that, had the Farmers intended to encompass benefits from private commercial transactions, they surely would have raised this issue. Yet, the President notes, the debates reflect no concern over constraints on private business. Id. ; Def.'s Mot. Dismiss at 40-41.
The President also argues that Plaintiffs' interpretation would create absurd consequences today. Def.'s Mot. Dismiss at 51-52. For example, he claims that if the Court were to adopt Plaintiffs' interpretation, it would mean that a federal official's stock holdings in a global company would violate the Foreign Emoluments Clause if some of that company's earnings could be traced to foreign governments. Id. at 52. In light of extremes such as this, the President urges the Court to reject Plaintiffs' broad interpretation.
Notwithstanding the parade of horribles the President calls up, the Court does not see how the historical record reflects anything other than an intention that the Emoluments Clauses function as broad anti-corruption provisions.
The Foreign Emoluments Clause was unquestionably adopted against a background of profound concern on the part of the Framers over possible foreign influence upon the President (and, to be sure, upon other federal officials). It is true that European heads of state before 1787 frequently conferred gifts on foreign statesmen, undoubtedly in many instances for the express purpose of currying favor with them. See Teachout, Corruption in America, supra , at 1-5. For example, Charles Coteworth Pinckney, a delegate to the Constitutional Convention from South Carolina who is credited with providing the final language for the Foreign Emoluments Clause, when speaking later at the South Carolina Ratification Convention, referred to the bribe of "Charles II., who sold Dunkirk to Louis XIV." See 4 Elliot, supra, at 264 (Pinckney discussing the susceptibility of the President to bribes). By the time of the Constitutional Convention, the delegates were "deeply concerned that foreign interests would try to use their wealth to tempt public servants and sway the foreign policy decisions of the new government." Zephyr Teachout, The Anti-Corruption Principle , 94 Cornell L. Rev. 341, 361 (2009) ; see also Sills, supra , at 72 (noting that Madison recorded that "15 delegates used the term 'corruption'; no less than 54 times" during the Constitutional Convention) (citing James D. Savage, Corruption and Virtue at the Constitutional Convention , 56 J. Pol'y 174, 174-76, 181-82 (1994) ).
Interestingly, during the Convention, the Framers did not include a Foreign Emoluments Clause in the first drafts of the Constitution. But the omission was soon perceived as being inconsistent with the Articles of Confederation, which had provided that: "[N]or shall any person holding any office of profit or trust under the United States, or any of them, accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State." Articles of Confederation of 1781, art.VI. This provision in the Articles, without a doubt, was drastic. Apparently in the view of some at the time, *897 such a flat prohibition against any such offerings by foreign governments could prove needlessly insulting to the foreign powers that only intended by their offering to express some sort of gratitude to representatives of the United States. Accordingly, there was a sense that a more flexible provision was needed. And very soon it came about. In general, federal officials would be prohibited from receiving any such benefits from foreign governments but, in appropriate circumstances, Congress would still be able to approve such offerings. See Sills, supra , at 69-71. Once the Foreign Emoluments Clause incorporated this compromise, it appears to have sailed through the Constitutional Convention. Pinckney introduced what would become the final language of the Clause on August 23, 1787. As reported by James Madison, Pinckney's rationale was to establish "the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence." 2 Max Farrand, The Records of the Federal Convention of 1787 389 (Max Farrand ed., Yale Univ. Press 1911). Joseph Story would later explain that the Foreign Emoluments Clause was adopted to protect against "foreign influence of every sort ." Joseph Story, 3 Commentaries of the Constitution 215-16 (1833) (emphasis added).
These concerns were carried forward to the ratification debates in the States. For example, during the Virginia Ratification Convention, in conjunction with a debate over Presidential elections, Edmond Randolph explained the purpose of the Foreign Emoluments Clause as a restriction "provided to prevent corruption." See 3 Elliot, supra , 465. At the same Convention, George Mason responded, expressing concern that it would be "difficult to know whether [the executive] receives emoluments from foreign powers or not" and that "the great powers of Europe" would "be interested in having a friend in the President of the United States." Id. at 484.
These anti-corruption concerns spilled over as well into discussion of the Domestic Emoluments Clause. Alexander Hamilton, in The Federalist No. 73, wrote that power over the President's salary would allow the legislature to "tempt him by largesses, to surrender at [his] discretion his judgment to their inclinations." Hamilton went on to say that "power over a man's support is a power over his will." Id. To combat this potential influence over the President, Hamilton emphasized that the Domestic Emoluments Clause should be applied broadly to protect the President's independence:
They can neither weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice. Neither the Union, nor any of its members, will be at liberty to give nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act. He can, of course, have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.
Id. Hamilton's statements most assuredly reflect a broader concern than merely "ensuring that a President's compensation remained unaltered during tenure." Def.'s Mot. Dismiss at 39.
Given these fundamental preoccupations, the President's interpretation of the limited meaning of the Emoluments Clauses cannot be the correct one. Yet again, his narrow interpretation of the word "emolument" would reduce the Clauses to little more than a prohibition of bribery which, in addition to already being addressed elsewhere in the Constitution,[31] *898 is, as Plaintiffs argue, a very difficult crime to prove. The recent Supreme Court case McDonnell v. United States , --- U.S. ----, 136 S.Ct. 2355, 195 L.Ed.2d 639 (2016), which involved receipt by the Governor of Virginia of numerous cash and in-kind benefits from a constituent, demonstrates the difficulty of determining precisely what constitutes an "official act" sufficient to establish a criminal quid pro quo . After McDonnell , "[t]o qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." Id. at 2372. Merely "setting up a meeting, talking to another official, or organizing an event" is not sufficient. Id. How difficult would it be, then, to demonstrate which payments made to the President by foreign, the federal, or domestic governments were being offered to him in an official capacity? As Professor Teachout has noted, "[c]orruption, in the American tradition, does not just include blatant bribes and theft from the public till, [it] encompasses many situations where politicians and public institutions serve private interests at the public's expense." Teachout, Corruption in America, supra , at 2. Where, for example, a President maintains a premier hotel property that generates millions of dollars a year in profits, how likely is it that he will not be swayed, whether consciously or subconsciously, in any or all of his dealings with foreign or domestic governments that might choose to spend large sums of money at that hotel property?[32] How, indeed, could it ever be proven, in a given case, that he had actually been influenced by the payments? The Framers of the Clauses made it simple. Ban the offerings altogether (unless, in the foreign context at least, Congress sees fit to approve them).[33]
Contrary to the President's assertion that the history surrounding the Clauses' adoption is "devoid of concern about private commercial business arrangements," several State constitutions adopted prior to the Convention were specifically designed to prevent public officials from placing *899 their private commercial interests over their duties to the American people. See, e.g. , Pa. Const. art. V (1776) ("That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or set of men, who are a part only of that community.") (emphasis added); Virginia Declaration of Rights, art. IV (1776) ("That no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services ....") (emphasis added). Though the President places much emphasis on the fact that many of the Framers and early Presidents maintained private businesses that "likely" transacted with foreign and domestic governments, he offers no evidence confirming this in fact to have been so. In any event, it must be remembered that the Emoluments Clauses only prohibit profiting from transactions with foreign, the federal, or domestic governments ; they do not prohibit all private foreign or domestic transactions on the part of a federal official. Absent the least evidence that early Presidents maintained businesses involving foreign and domestic governments , the President's argument in this regard, even if theoretically relevant, is based wholly on speculation.
Finally, the Court does not accept the President's argument that construing the term "emolument" broadly would result in the absurd consequences of which he warns. The historical record demonstrates that the Framers were fundamentally concerned with transactions that could potentially influence the President's decisions in his dealings with specific foreign or domestic governments, not with de minimis situations.[34] Clearly "emoluments" such as mutual funds or "mere stock holdings by a covered official in companies that conduct business globally," Def.'s Mot. Dismiss at 52, of the sort that could be traced to a foreign or domestic government are de minimis . It is highly doubtful that instances such as these could be reasonably construed as having the potential to unduly influence a public official.[35] On the other hand, sole or substantial ownership of a business that receives hundreds of thousands or millions of dollars a year in revenue from one of its hotel properties where foreign and domestic governments are known to stay (often with the express purpose of cultivating the President's good graces) most definitely raises the potential for undue influence, and would be well within the contemplation of the Clauses.[36]
*900 The Court is satisfied, consistent with the text and the original public meaning of the term "emolument," that the historical record reflects that the Framers were acutely aware of and concerned about the potential for foreign or domestic influence of any sort over the President. An "emolument" within the meaning of the Emoluments Clauses was intended to reach beyond simple payment for services rendered by a federal official in his official capacity, which in effect would merely restate a prohibition against bribery. The term was intended to embrace and ban anything more than de minimis profit, gain, or advantage offered to a public official in his private capacity as well, wholly apart from his official salary.
4) Executive Branch Precedent and Practice
In further support of their position, Plaintiffs emphasize that the Office of Legal Counsel (OLC) and the Comptroller General of the United States[37] have consistently interpreted the term "emolument" to cover "any profits" accepted from a foreign or domestic government. Pls.' Opp'n at 36 (citing Applicability of the Emoluments Clause to Non-Gonverment Members of ACUS, 17 Op. O.L.C. 114, 119 (1993) ). The Government has reached this conclusion, Plaintiffs emphasize, even in the absence of "direct personal contact or relationship between the [federal officer] and a foreign government." Pls.' Opp'n at 36, 47 (citing 17 Op. O.L.C. at 117-119 (concluding that the Foreign Emoluments Clause applied to federal officers who were also partners in law firms that did business with foreign governments) ). Plaintiffs cite a recent opinion of the Office of Congressional Ethics (OCE)[38] which they claim is directly on point. Id. at 37 (citing OCE Report, Review No. 17-1147 (June 2, 2017) ). In that opinion, the OCE determined that a federal officeholder's acceptance of profits derived from the rental of rooms to a foreign government violated the Foreign Emoluments Clause. Id. Plaintiffs urge the Court to give considerable weight to these Government opinions, noting that the President has cited no precedent from any of these agencies applying his narrower definition of "emolument." Id.
Notwithstanding his inability to cite opinions squarely in his favor, the President insists that his position is not inconsistent with the Government opinions Plaintiffs cite. Indeed, he says, the facts underlying many of the opinions on which Plaintiffs rely in fact involved proposed employment relationships between a federal official and a foreign government. Def.'s Reply at 22. For example, he says, two of the OLC opinions cited by Plaintiffs concerned the prospective rendering of personal services by the federal official to the foreign government. Id. (citing Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act , 6 Op. O.L.C. 156, 156-57 (1982) (a Nuclear Regulatory Commission employee could not "on his leave time" work for an American consulting firm on a project for the Mexican government where the firm secured the contract based solely *901 on the employee's expertise and would pay the employee using foreign funds); Memorandum from H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales , at 1 (May 23, 1986), available at https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 (Foreign Emoluments Clause could apply to NASA scientist accepting a fee for providing consulting services to a foreign university) ). Thus, he claims, the Government opinions upon which Plaintiffs rely are distinguishable from the instant case.
The President also cites a 1981 OLC opinion and a 1983 Comptroller General decision, both relating to President Ronald Reagan's retirement benefits from the State of California, which he contends, implicitly at least, run counter to Plaintiffs' position. Def.'s Reply at 24; Def.'s Mot. Dismiss at 47-48 (citing President Reagan's Ability to Receive Retirement Benefits from the State of California , 5 Op. O.L.C. 187, (1981); Comp. Gen. B-207467, 1983 WL 27823 (1983) ). In those decisions, both Government entities determined that while in office, President Reagan could continue to receive retirement benefits from the State of California, where he had served as Governor, without violating the Domestic Emoluments Clause. Def.'s Mot. Dismiss at 47. According to President Trump, these decisions cannot be squared with Plaintiffs' definition of "emolument," since retirement benefits surely fall within "anything of value." Def.'s Reply at 24.
Historical practice, the President says, supports his position. He points to a business transaction President Washington had with the Federal Government wherein, as a private citizen, he purchased several lots of public land at a public sale. Though Washington himself had authorized the sale and the sale was conducted by the Commissioners of the District of Columbia, President Trump notes that no one at the time voiced Domestic Emoluments Clause concerns. This, he claims, indicates that private commercial transactions were not thought as being within the scope of the Clause. Def.'s Mot. Dismiss at 43 (citing Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074). This is especially important, he submits, because President Washington's conduct has been accorded great weight in constitutional interpretation. Def.'s Reply at 26.
Moreover, the President notes, President Washington's conduct was hardly unique. The President highlights the fact that many early Presidents engaged in private commerce, suggesting that it is reasonable to infer that at least some of their transactions must have been with foreign or state government entities. Id.
The Court finds executive branch precedent and practice overwhelmingly consistent with Plaintiffs' expansive view of the meaning of the term "emolument." The President has not cited a single Government opinion that conclusively supports his position. He simply submits that his proposed definition is "not inconsistent" with existing precedent. That sort of argument clearly does not make the grade. OLC pronouncements repeatedly cite the broad purpose of the Clauses and the expansive reach of the term "emolument." See, e.g., Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians , 11 Op. O.L.C. 89, 90 (1987) ("Consistent with its expansive language and underlying purpose, the [Foreign Emoluments Clause] has been interpreted as being 'particularly directed against every kind of influence by foreign governments upon officers of the United States, *902 based upon historic policies as a nation.' " (quoting 24 Op. Att'y Gen. 116, 117 (1902) (emphasis omitted) ); Applicability of the Emoluments Clause to Nongovernment Members of ACUS , 17 Op. O.L.C. 114, 121 (1993) ("The language of the Emoluments Clause is both sweeping and unqualified."); Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff at 2 (Oct. 16, 1962), https://www.justice.gov/olc/page/file/935741/download (noting "the sweeping nature of the constitutional prohibition and the fact that in the past it has been strictly construed, being directed against every possible kind of influence by foreign governments over officers of the United States."); see also Sills, supra , at 84-85 ("Longstanding OLC and DOJ opinions dating back to1902 have embraced this definition."). The main takeaway from executive precedent stands in bold relief: The Emoluments Clauses are intended to protect against any type of potentially improper influence by foreign, the federal, and state governments upon the President.
Further, in line with the purposive analysis when deciding whether a particular arrangement is constitutional, Government officials have carefully considered the extent to which the arrangement at issue contains the potential for improper influence.[39] When that potential has been determined to exist, the Government has found Emoluments Clause violations. Take, for instance, the 1993 OLC opinion cited by Plaintiffs that concerned members of the Administrative Conference of the United States (ACUS),[40] who were also lawyers at private law firms. The question was whether they could receive partnership distributions from their firms where the firms received fees from foreign government clients. The OLC concluded that this was prohibited even though the lawyers "did not personally represent a foreign government, and indeed where they had no personal contact with that client of the firm." 17 Op. O.L.C. at 119. In reaching this conclusion, the OLC stated:
Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.
Id. This language directly contradicts the President's suggestion that there can be no violation of the Foreign Clause if the federal official is receiving benefits in a private capacity.[41]
*903 One of the OCE's more recent opinions leaves little doubt that official action is not required before there can be an Emoluments Clause violation. In a June 2, 2017, opinion, the OCE directly addressed the question of whether a federal official's acceptance of profit derived from the rental of rooms to a foreign government runs afoul of the Foreign Emoluments Clause. The OCE concluded that "the term 'emoluments' is not limited to payments from a foreign government that result from an individual's official duties" but that "the receipt of profit from a foreign government for rental property may implicate the constitutional prohibition against receipt of 'any emolument' of 'any kind whatever' from a foreign state." See OCE Report, Review No. 17-1147 at 12-13 (June 2, 2017), https://ethics.house.gov/sites/ethics.house.gov/files/OCE% 20Report% 20and% 20Findings_6.pdf.
The President falls back on the Government opinions concerning President Reagan's California retirement funds, but the Court finds those decisions easily distinguishable. As Plaintiffs suggest, both the OLC and the Comptroller General reached the conclusion that there were no was no Domestic Emoluments Clause violation after determining that the retirement benefits from his time as Governor Reagan of California had become "vested rights" before he took office as President Reagan of the United States. See President Reagan's Ability to Receive Retirement Benefits from the State of California , 5 Op. O.L.C. 187, 187-88 (1981) (stating the benefits were "vested rights" rather than "gratuities which the State is free to withdraw."); Comp. Gen. B-207467, 1983 WL 27823, at *3 (1983) (reaching the same conclusion because the benefits were "previously earned," "fully vested," and "set by statute"). Both decisions place great emphasis on whether the benefits at issue would be the type that could potentially influence the President. Given the vested nature of the retirement benefits prior to Governor Reagan's ascendancy to the Presidency, both the OLC and Comptroller General determined that they were not likely to have any effect. See 5 Op. O.L.C. at 192 (concluding that state pension "benefits are not emoluments in the constitutional sense," and their "receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence."); Comp. Gen. B-207467, 1983 WL 27823, at *3 (finding it "highly unlikely that the President could be swayed in his dealings with the State of California by the prospect of having his pension diminished or rescinded by the State."). On the other hand, profits received from foreign or domestic governments that patronize the Trump International Hotel for the express purpose of potentially currying favor with a sitting President present a stark contrast to the fully vested retirement benefits that then-Governor Reagan earned from the State of California which the State of California was not free to withdraw.
President Trump's appeal to historical practice does not aid his argument. As noted previously, he has provided no evidence-none-that any trading partners of the early Presidents actually were either foreign or domestic governments . Though he relies heavily on a purported potential Domestic Emoluments Clause violation by President Washington-the surrounding facts of which are seriously incomplete (e.g., What sort of public auction was held? How was it advertised? How many bidders were involved?)-as Plaintiffs note, Washington *904 later made clear that he was "ready to relinquish" the property if necessary, which itself calls into question the actual relevance of this transaction. See Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), Founders Online, National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Washington/05-15-02-0289. In any event, even indulging the inference that President Trump urges the Court to make regarding President Washington's purchase of public land, the Court would not find this single example substantial enough, when weighed against the vast amount of historical evidence, textual support, and executive branch precedent to the contrary, to support the President's narrow construction of the term "emolument."
Executive branch precedent and practice have clearly and consistently held, apart from de minimis instances,[42] that both Emoluments Clauses prohibit Presidents from receiving any profit, gain, or advantage from foreign, the federal, or domestic governments, except in the case of the Foreign Clause, where Congress approves. Based on precedent from the OLC and Comptroller General, there would be an exception, at least under the Domestic Emoluments Clause, where the thing of value received by the federal office holder, after the fashion of the Reagan-California pension precedent, was fully vested and indefeasible before the federal official became a federal official, the rationale being that the benefit would lack any potential to influence the federal office-holder in his decision-making.[43]
* * *
For the foregoing reasons, the Court finds the President is subject to both Emoluments Clauses of the Constitution and that the term "emolument" in both Clauses extends to any profit, gain, or advantage, of more than de minimis value, received by him, directly or indirectly, from foreign, the federal, or domestic governments. This includes profits from private transactions, even those involving services given at fair market value.[44] In the case of the Foreign Emoluments Clause, unless Congress approves, receipt of the emolument is prohibited. In the case of the Domestic Clause, receipt of any emolument is flatly prohibited.
IV. THE PRESIDENT'S MOTION TO DISMISS
A. Legal Standard
A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) will be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."
*905 Presley v. City of Charlottesville , 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc. , 591 F.3d 250, 255 (4th Cir. 2009).
B. The Applicability of the Emoluments Clauses
Based on the foregoing, the Court finds that the Amended Complaint states plausible claims against the President under both the Foreign and Domestic Emoluments Clauses.[45]
1) Foreign Emoluments Clause Violations
With respect to the Foreign Emoluments Clause, Plaintiffs have alleged that foreign governments or their instrumentalities have patronized the Trump International Hotel, spending government funds to stay at the Hotel, eat at its restaurant, and sponsor events in the Hotel's event spaces. Am. Compl. ¶¶ 39-43. They have done so in some cases with the express intention to cater to the good graces of the President. For example, the Amended Complaint alleges that the Kingdom of Saudi Arabia spent thousands of dollars at the Hotel between October 1, 2016, and March 31, 2017, and that the Embassy of Kuwait, moving from another private hotel in the District, held its National Day celebration at the Hotel on February 22, 2017. Id. ¶¶ 40-41. Plaintiffs allege that the President has received or potentially could receive the profits derived from these foreign governments through his ownership of the Hotel through the Trump Organization. Id. ¶¶ 29, 34-36. Finally, Plaintiffs allege (and the *906 President does not contest) that he has not received consent of Congress to receive such monies from foreign governments. Id. ¶ 33.
The Court finds that these allegations plausibly state a claim under the Foreign Emoluments Clause.
2) Domestic Emoluments Clause Violations
Plaintiffs make several claims with respect to the Domestic Emoluments Clause.
i. The GSA Lease
Plaintiffs allege that the Hotel received an emolument from the Federal Government in the form of the GSA Lease, which governs the Hotel's use of the Old Post Office Building in the District of Columbia, where the Hotel is situated. Section 37.19 of the Old Post Office Lease states: "No... elected official of the Government of the United States ... shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." Am. Compl. ¶ 82. Plaintiffs allege that, before the President's inauguration, the then-Deputy Commissioner of the GSA indicated that the President would be in violation of the Lease unless he fully divested himself of all financial interests in it. Id. ¶ 83. Shortly after his inauguration, the President replaced the Acting Administrator of the GSA. Id. Plaintiffs allege that several weeks later, on March 16, 2017, less than two months into his term, the President released a proposed budget for 2018 that increased the GSA's funding, while cutting back on other the funding of other agencies. Id. ¶ 84. On March 23, 2017, the GSA issued a letter determining that the President and the Hotel were not in violation of the Lease. Id. Plaintiffs allege that the GSA's abrupt about-face position was and is in direct contradiction of the plain terms of the Lease and that, by determining that the Hotel was and is in compliance with the Lease, the Federal Government bestowed upon the President an emolument in violation of the Domestic Emoluments Clause. Id. ¶ 86.
These allegations plausibly state a claim under the Domestic Emoluments Clause.
ii. Patronage of the Hotel by State Governments
In addition to foreign governments patronizing the Hotel, Plaintiffs claim that at least one State-Maine-has patronized the Hotel, spending state funds for its Governor and his entourage to stay at the Hotel and to frequent its facilities during an official visit of those officials to Washington, including an encounter with the President where Presidential action of interest to the Governor took place. Pls.' Opp'n. at 8. Plaintiffs allege on information and belief other States may have done likewise. See Am. Compl. ¶ 98.
These allegations plausibly state a claim under the Domestic Emoluments Clause.
iii. Tax Concessions from the D.C. Government
Plaintiffs further claim that, in connection with the Hotel, the President has received substantial tax concessions from the District of Columbia. Pls.' Opp'n at 12 (noting that "just one week after the election, the President's company re-filed a previously dismissed lawsuit against the District, seeking a reduction in its tax bill for the Hotel."). At the time of the briefing in this case, the Trump Organization had only applied for District of Columbia tax concessions. Since then, the District's tax authorities, according to a report in the Washington Post , after dismissal of a previously filed lawsuit, in fact granted the Hotel a reduction in the Organization's 2018 tax bill, for a savings of $991,367.00.[46]
*907 These allegations plausibly state a claim under the Domestic Emoluments Clause.
As with their Foreign Emoluments Clause claim, Plaintiffs allege that the President has received all the foregoing benefits on account of his ownership of the Hotel. Am. Compl. ¶¶ 29, 34-36.[47]
The Court finds that these allegations, depending on the evidence adduced, would fairly establish Plaintiffs' claims challenging the President's receipt of emoluments from the federal and state governments under the Domestic Emoluments Clause.
V. CONCLUSION
In sum, Plaintiffs have plausibly alleged that the President has been receiving or is potentially able to receive "emoluments" from foreign, the federal, and state governments in violation of the Constitution: They have stated viable claims for relief under both the Foreign and Domestic Emoluments Clauses.
Accordingly, the President's Motion to Dismiss is DENIED insofar as it pertains to the claims which the Court has determined Plaintiffs have standing to pursue, viz., that the President may have violated the Foreign and Domestic Emoluments Clauses of the Constitution insofar as he is involved, directly or indirectly, with the Trump International Hotel in Washington, D.C.
The Court DIRECTS the parties to promptly consult and within twenty-one (21) days submit a Joint Recommendation suggesting the next steps to be taken in the case, including whether any further amendment of the Amended Complaint is necessary, what the time for the President to file an Answer herein should be, what the general outline of any proposed discovery should be, and any other matter the parties deem appropriate to bring to the attention of the Court.
The Court will address the President's Motion to Dismiss the individual capacity claims against him in a subsequent Opinion.
A separate Order will ISSUE.

See Opinion (Mar. 28, 2018), ECF No. 101 (Standing Opinion).

On February 23, 2018, without objection by the President, Plaintiffs filed a Motion for Leave to File an Amended Complaint which would add him as a Defendant in his individual capacity. On March 12, 2018, the Court granted the Motion, accepting the proposed Amended Complaint that accompanied the Motion. Mem. Order (Mar. 12, 2018), ECF No. 94. The Court, however, decided to proceed on the official capacity claims separately so that its Standing Opinion addressed only the standing arguments raised by the President in his official capacity. On May 1, 2018, the President, in his individual capacity, filed a separate Motion to Dismiss. Def.'s Mot. Dismiss (May 1, 2018), ECF No. 112 (Individual Capacity Motion).The Court will address the individual capacity claims and the arguments to dismiss them in a separate Opinion. The present Opinion addresses only those arguments pertaining to the President's official capacity as set forth in his Motion to Dismiss.

The Foreign Emoluments Clause , U.S. Const. art. I, § 9, cl. 8, provides that "no Person holding any Office of Profit or Trust under them [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."
The Domestic Emoluments Clause , U.S. Const. art. II, § 1, cl. 7, provides: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."

Both the original and Amended Complaint alleged violations going well beyond those involving the Hotel in the District of Columbia. The Court, in its Standing Opinion, found that Plaintiffs had demonstrated the requisite injury-in-fact for standing purposes only with respect to the Hotel and to the activities of the Trump Organization relating to it. It held that, while the President's and the Trump Organization's operations outside the District of Columbia might at some other time and/or some other place be the subject of a lawsuit or lawsuits, they were not part of the present one.

For a more detailed discussion of the facts alleged in the Amended Complaint, see the Court's Standing Opinion. Standing Op. at 2-7.

According to a February 2018 press report, the President stated that he had paid to the U.S. Treasury profits the Hotel had received from foreign governments. No details with respect to such payments, however, were provided, viz., when the payments were made, which governments or their instrumentalities made them, how much each paid, how the amounts each paid were calculated, who verified the calculations, and how much was calculated over what period of time. See David A. Fahrenthold & Jonathan O'Connell, Trump Organization Says It Has Donated Foreign Profits to U.S. Treasury, but Declines to Share Details , Wash. Post (Feb. 26, 2018), https://www.washingtonpost.com/politics/trump-organization-says-it-has-donated-foreign-profits-to-us-treasury-but-declines-to-share-details/2018/02/26/747522e0-1b22-11e8-ae5a-16e60e4605f3_story.html?utm_term=.d8a282e07ec0. Nor is there any indication as to whether the President has made any such payments since the payments reported in February 2018.

The Court notes that, as reported by the press, the President's trust allows him to withdraw money from any business at any time, and that the trustees "shall distribute net income or principal to Donald J. Trump at his request," or whenever they "deem appropriate." The trustees of the trust are Donald Trump, Jr. and the Trump Organization Chief Financial Officer Allen Weisselberg. Drew Harwell, Trump Can Quietly Draw Money from Trust Whenever He Wants, New Documents Show , Wash. Post. (Apr. 3, 2017), https://www.washingtonpost.com/politics/trump-can-quietly-draw-money-from-trust-whenever-he-wants-new-documents-show/2017/04/03/7f4c0002-187c-11e7-9887-1a5314b56a08_story.html?utm_term=.b2e411341812.

The President does not appear to dispute that, under Plaintiffs' interpretation of the term, the Amended Complaint would state a claim or claims for relief.

Strict constructionism, referred to sometimes as "strict originalism," is the theory that constitutional interpretation requires following the literal text and specific intent of the Constitution's drafters. See, e.g., Erwin Chemerinsky, Constitutional Law: Principles and Policies 19 (3d ed. 2006).

While the distinction between strict constructionism and more moderate originalism is not always clear, originalism is "more concerned with the adopters' general purposes than with their intentions in a very precise sense." In other words, originalism focuses on the Framers' general concepts when drafting a particular constitutional provision rather than their specific intent at the time. See id.

Original meaning is yet another variation on originalism propounded by Justice Antonin Scalia which looks to historical practices and the understanding at the time of the drafting of the Constitution to determine the original meaning of a particular constitutional provision. See id. at 20.

The purposive approach seeks to interpret a constitutional provision within the context of its purpose. "Purposive Construction," Black's Law Dictionary (9th ed. 2009).

Those who promote the theory of a "Living Constitution" argue that the Constitution must be able to adapt to current needs and attitudes that have changed since the original drafting. In other words, the Constitution does not have one fixed meaning but is a dynamic document the meaning of which can change over time. See, e.g. , Kermit Roosevelt, Originalism and the Living Constitution: Reconciliation at 1 (July 2007), https://www.acslaw.org/sites/default/files/Kermit% 20Roosevelt% 20Vanderbilt% 20Paper% 207-2007.pdf.

Although the parties' briefs now and again seem to suggest that their interpretation of the Emoluments Clauses and especially the meaning of the term "emolument" are self-evident almost to the point of evoking the Plain Meaning Rule, neither side of course goes that far. But this is perhaps a convenient starting place to question the logic of the President's view that an "emolument" has to be employment-related and therefore when he receives emoluments from foreign states, e.g. , for private services rendered, his actions are not covered by the Emoluments Clauses. Accepting the President's argument arguendo , why doesn't logic suggest that the foreign and domestic government payments he receives in connection with the Hotel are in fact an "emolument" to his salary as President? Especially when foreign governments are on record as saying that they have been or will be patronizing the Hotel precisely because the President is the President? And what if the foreign and state governments pay a premium over market to patronize the Hotel? In other contexts, padded contracts have been held to cover illegitimate payments over and above otherwise legitimate payments for services rendered.

There is no dispute that the President is covered by the Domestic Emoluments Clause. He is named in the text and is the sole subject of the Clause. See U.S. Const. art. II, § 1, cl. 7 ("The President shall....").

The OLC or Office of Legal Counsel is an office within the Department of Justice that drafts legal opinions for the Attorney General and provides its own written opinions and other advice in response to requests from the Counsel to the President, the various agencies of the Executive Branch, and other components of the Department of Justice. See "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc. Although not binding on courts, OLC opinions are entitled to considerable weight because they "reflect[ ] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies." United States v. Arizona , 641 F.3d 339, 385 n.16 (9th Cir. 2011) (Bea, J., concurring) (quoting Congressional Research Service, Authority of State and Local Police to Enforce Federal Immigration Law, Sept. 17, 2010, http://www.ilw.com/immigrationdaily/news/2010, 1104-crs.pdf), aff'd in part, rev'd in part , 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ); see also Cherichel v. Holder , 591 F.3d 1002, 1016 & n.17 (8th Cir. 2010) ("We note, however, that while OLC opinions are generally binding on the Executive branch, the courts are not bound by them.") (citations omitted); N.Y. Times Co. v. U.S. Dep't of Justice , 138 F.Supp.3d 462, 478 (S.D.N.Y. 2015) ; Public Citizen v. Burke , 655 F.Supp. 318, 321-22 (D.D.C. 1987).

For further examples of the "bizarre consequences" resulting from the interpretation advanced by Professor Tillman, see the Brookings Memorandum's discussion at pages 8-9. Id. (noting that under Professor Tillman's interpretation, the President could simultaneously hold a seat in Congress, sit in the Electoral College, and be subject to a religious test); see also Saikrishna Prakash, Why the Incompatibility Clause Applies to the Office of the President , 4 Duke J. Const. L. & Pub. Pol'y 143, 148-51 (2009).

See discussion in Section III.B.3, infra .

See the discussion regarding the original public meaning of the term in Section III.B.2, infra .

The Incompatibility Clause, U.S. Const. art. I, § 6, cl. 2, provides: "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time." (emphasis added).

Noscitur a sociis "is a rule of construction applicable to all written instruments" and applies to terms "the meaning naturally attaching to them from their context." Virginia v. Tennessee , 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537 (1893) ; see also "Noscitur a sociis ," Black's Law Dictionary (9th ed. 2009).

See Section III.B.2, infra , for a more detailed discussion on the ordinary use of the term.

U.S. Const. art. II, § 4 provides: "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."

At various times Plaintiffs use the term "anything of value," which the President argues leads to absurd consequences. Hr'g Tr. at 7:8- 8:13, 26:20-28:8, 41:20-25, June 11, 2018 (Hr'g Tr.). The Court relies on the dictionary definitions of the period of "profit," "gain," or "advantage," see the discussion in Section III.B.2, infra , which the Court reads in most contexts as essentially synonymous with the words "anything of value." However, to the extent these terms may differ, the Court interprets the term "emolument" consistent with the dictionary definitions, i.e., "profit," "gain," or "advantage."

In writing his article, Professor Mikhail looked at "how 'emolument' is defined in English language dictionaries published from 1604 to 1806, as well as in common law dictionaries published from 1523 to 1792. To document its primary claims, the article includes over 100 original images of English and legal dictionaries published between 1523 and 1806." Id.

Those dictionaries are: Samuel Johnson, A Dictionary of The English Language (1755); Nathan Bailey, A Universal Etymological English Dictionary (1721); Thomas Dyche & William Pardon, A New General English Dictionary (1735); and John Ash, The New And Complete Dictionary Of The English Language (1775). See Mikhail, The Definition of "Emolument," supra , at 14-18.

See also id. App. §§ 1, 2 (discussing conveyances of land together with all "privileges, profits, easements, commodities, advantages, emoluments , hereditaments, and appurtenances whatsoever") (emphasis added); 1 Blackstone, *106 ("[W]hereby the whole island and all its dependencies, so granted as aforesaid, (except the landed property of the Atholl family, their manorial rights and emoluments , and the patronage of the bishopric and other ecclesiastical benefices) are unalienably vested in the crown, and subjected to the regulations of the British excise and customs.") (emphasis added); id. *470 ("At the original endowment of parish churches, the freehold of the church, the churchyard, the parsonage house, the glebe, and the tithes of the parish, were vested in the then parson by the bounty of the donor, as a temporal recompence to him for his spiritual care of the inhabitants, and with intent that the same emoluments should ever afterwards continue as a recompense for the same care.") (emphasis added); 4 Blackstone, *430 ("emolument of the exchequer").

Benjamin Franklin, James Madison, Robert Morris, and James Wilson were all known to have referenced Smith's book. See, e.g. , Brief of Amici Curiae by Certain Legal Historians on Behalf of Pls. at 7 n.19 (Nov. 28. 2017), ECF No. 69 (Legal Historians Br.) (citing 23 The Papers of Benjamin Franklin 241-43 (1983) (W. B. Willcox, ed.) (noting that "Smith's Wealth of Nations" was sent to Franklin); 6 The Papers of James Madison 62-115 (W. T. Hutchinson & W. M. E. Rachal, eds., 1969) (including "Smith on the Wealth of Nations" in his book list); David Lefer, The Founding Conservatives 245-246 (2013) (Morris "found Smith's thought so persuasive ... that he gave out copies to members of Congress"); 1 Collected Works of James Wilson 60-79, 73-74 (K.L. Hall & M.D. Hall eds., 2007) (quoting Smith's remarks on banking) ); Mikhail, The Definition of "Emolument," supra , at 12 (same).

In fact, as Ms. Sills, a Non-Resident Fellow at Georgetown University Law Center, notes, in contrast to Hoyt , "other Supreme Court opinions reflect an understanding that the meaning of the term extends beyond compensation associated with a governmental office." Sills, supra , at 93 (citing Charles River Bridge v. Warren Bridge , 36 U.S. (11 Pet.) 420, 586, 9 L.Ed. 773 (1837) ("The proprietors have, under these grants, ever since continued to possess and enjoy the emoluments arising from the tolls taken for travel over the bridge; and it has proved a very profitable concern."); Town of East Hartford v. Hartford Bridge Co. , 51 U.S. (10 How.) 511, 516, 13 L.Ed. 518 (1850) ("That with the exception of the time when the bridge of the petitioners has been impassable, and said town of Hartford has by law been compelled to keep up said ferry, the said town of Hartford has not made any use of said ferry as a franchise, or derived any benefit or emolument therefrom, since the year 1814.") ).

For more examples of Washington's use of the term "emolument," see Mikhail, The Definition of "Emolument," supra , at 19-20 n.117; Legal Historians Br. at 23 n.68.

U.S. Const. art. II, § 4 provides: "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."

As recently reported in the press, the President's Hotel in Washington "is one of [his] best performing properties." The President's recent financial disclosure listed the revenue of the Hotel at $40.4 million for the 2017 calendar year. Steve Eder, Eric Lipton, & Ben Protess, Trump Discloses Cohen Payment Raising Questions About Previous Omission , N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-financial-disclosure.html. It remains to be seen how much of that revenue comes from foreign, federal, and domestic governments.

Recognizing the possibility of foreign influence on the actions of federal officials in general, Congress enacted the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342, which prevents federal employees, including the President, from accepting any more than a de minimis "gift or decoration," except in accordance with certain proscribed provisions. Those provisions require federal officials to file reports of such offerings with their respective agencies, which then review the filings for compliance with the Act. Id. § 7342(f).
The statute holds interesting implications for the present case. It applies to a "gift" from a foreign government-essentially synonymous with the term "present" in the Foreign Emoluments Clause-but does not cover "emoluments." This seems to suggest that, in enacting the statute, Congress understood that "emolument" had a meaning separate and distinct from "present" (i.e., gift) in the Foreign Clause.
Further, the statute establishes a procedure for obtaining the approval Congress is required to give under the Foreign Clause, delegating to various agencies the actual authority to approve a foreign "gift" (i.e., "present"). Any other "profit," "gain," or "advantage" received from a foreign government-as Plaintiffs have appropriately defined "emolument"-would be left to Congressional approval on a case-by-case basis.

Yet another very familiar Latin precept to the fore: De minimis non curat lex ("The law takes no note of trifles.").

If, however, the federal official owned a majority stake in a company that transacted extensive business with foreign or domestic governments or if it could be shown that a foreign or domestic government was using the company as a conduit to improperly influence the federal official, this would almost certainly no longer be de minimis .

The President has argued that former Secretary of Commerce Penny Pritzker's stock holdings in Hyatt Hotels, which foreign and presumably state governments may have patronized, could constitute Emoluments Clause violations under Plaintiffs' interpretation. Similarly, counsel has suggested that President Obama's book sales to a foreign government, from which he presumably received royalties, could be prohibited based on Plaintiffs' interpretation of what constitutes "emoluments." Hr'g Tr. at 27:5-17; 33:2-21. The Court obviously does not have sufficient facts before it as to those transactions to be able to hypothesize whether or not they involved Emoluments Clause violations. As far as the Court can tell, no one ever raised such challenges. In any event, the fact that no one may have challenged these transactions in no way establishes that Plaintiffs' interpretation of the term "emolument" in the present case is erroneous.

As to the OLC, see note 16, supra . The Comptroller General heads the Government Accountability Office, an agency within the legislative branch of the federal government. It carries out audit, evaluative, and investigative assignments, provides legal analyses to Congress, and issues legal decisions. "Office of the Comptroller General," U.S. Government Accountability Office, https://www.gao.gov/about/workforce/ocg.html.

The Office of Congressional Ethics (OCE) of the U.S. House of Representatives is an independent, non-partisan entity charged with reviewing allegations of misconduct against Members, officers, and staff of the U.S. House of Representatives. "Learn about the Office of Congressional Ethics," Office of Congressional Ethics, https://oce.house.gov/.

The purposive analysis effectively brings down the President's argument that "absurd consequences" would result from Plaintiffs' interpretation of the term. None of the hypotheticals he cites are of the sort that would suggest the possibility of improper influence over the President. See discussion in Section III.B.3, supra .

ACUS is a nonpartisan, independent federal agency charged with convening expert representatives from the public and private sectors to recommend improvements to administrative process and procedure. "About," Administrative Conference of the United States, https://www.acus.gov/.

Though the OLC subsequently reconsidered its conclusion in this case on the ground that the private members of the ACUS were not in fact officials within the meaning of the Foreign Emoluments Clause, it did not revise its previous analysis that the monies were in fact "emoluments" covered by the Clause. Applicability of the Emoluments Clause to Nongovernmental Members of ACUS , 34 Op. O.L.C. (June 3, 2010), https://www.justice.gov/sites/default/files/olc/opinions/2010/06/31/acus-emoluments-clause_0.pdf.

Cf. note 33, supra , regarding the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342.

See pages 903-04, supra .

But again there is the matter of private services compensated at a level above fair market value. If the President's definition of "emolument" is accepted, i.e., that it applies only to payments made to him qua President, what is to be made of payments to the Hotel by foreign, federal, or state governments at a premium over market? See note 14, supra . According to the President's attorney at oral argument, the answer is there is nothing to be done. See Hr'g Tr. at 33:22-34:10 (stating that this would not be an Emoluments Clause violation because "[i]t's just more profit").

During oral argument, the President's counsel claimed that only two alleged violations are before the Court: 1) Hotel stays by foreign governments; and 2) the General Services Administration (GSA) Lease. Hr'g Tr. at 6:7-15; 43:23-25. However, in the course of their pleadings, Plaintiffs have asserted at least two other possible violations of the Domestic Emoluments Clause. One pertains to the issue of State government patronage of the Hotel and the other to tax subsidies granted to the Hotel by the District of Columbia. These allegations do not specifically appear in the Amended Complaint. But see Am. Compl. ¶ 98 ("Upon information and belief, federal, state, and local governments, or their instrumentalities, have made and will continue to make payments for the use of facilities owned or operated by the defendant for a variety of functions. The defendant will receive a portion of those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause."). Even so, the Court notes that the President is already on fair notice as to these two additional allegations by reason of Plaintiffs' subsequent pleadings. The overarching purpose of Plaintiffs' case is to pursue the extent to which any precluded entities may have unduly bestowed actual or potential benefits upon the President through their patronage of the Trump International Hotel. The specific examples cited in the Amended Complaint are no more than that-examples. They do not limit Plaintiffs' ability to inquire only into the specific examples alleged. It is therefore inaccurate to say that only two possible violations are before the Court. See Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests' .... [It] does not need detailed factual allegations.") (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ). Here, Plaintiffs have sufficiently identified the possibility of these additional potential violations through their pleadings, which should at least permit them to be further explored on discovery. That said, at some point if need be, the Court will entertain a motion to further amend the Amended Complaint to embrace these and other appropriately "specific" alleged violations.

See Jonathan O'Connell, Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million , Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/news/business/wp/2018/01/12/tax-officials-reduce-trumps-tax-bill-on-d-c-hotel-by-nearly-1-million/?utm_term=.6b527c071c30.

Congress is not mentioned in the Domestic Emoluments Clause. Consequently, it has no role to approve or disapprove the acceptance of any "emoluments" a federal official may receive from the federal or state governments.